IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. CR-09-065-S-BLW |
| Plaintiff, | ) | CR-09-064-S-BLW |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| JEFFREY RAY KOEPNICK and | ) | |
| MARCUS JORDAN KOEPNICK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The Court has before it Motions to Suppress by Defendants Jeffrey Ray

Koepnick (Docket No. 16 in Case No. CR-09-065-S-BLW) and Marcus Jordan

Koepnick (Docket No. 23 in Case No. CR-09-064-S-BLW).  The Court held an

evidentiary hearing on the motions on July 15 and 24, 2009.  For the reasons set

forth below, the Court grants the motion as to Jeffrey Koepnick, but denies the

Motion as to Marcus Koepnick.

## BACKGROUND

On February 25, 2009, Twin Falls police officer Clint Doerr went to 457

Bracken Street, hoping to find Marcus Jordan Koepnick.   Marcus was the subject

of an active arrest warrant and was believed to reside at that address.  On Officer

**Memorandum Decision and Order - page 1**

Doerr's approach, he saw someone resembling Marcus step outside the front door of the address, retrieve a newspaper, then quickly re-enter the house. Officer Doerr knocked at the front door, and Jeffrey Ray Koepnick, Marcus's father, answered the door. Officer Doerr explained he was looking for Marcus, as there was an active warrant for his arrest, and told Jeffrey he had just seen someone resembling Marcus enter the house.

Jeffrey told Officer Doerr he was not sure if Marcus was in the house, but welcomed the officer to enter and look. Jeffrey made clear and Officer Doerr understood that the scope of the search was limited to a search for Marcus. Jeffrey accompanied and assisted Officer Doerr in searching much of the house. In fact, Koepnick provided Doerr with a ladder to assist him in searching a crawl space in the attic. At one point, Jeffrey put his dog in a bedroom where his friend William Wood was seated. Officer Doerr looked into the room but did not search it at that time.

On the arrival of backup Officer Silvester, Officer Doerr went to search the bedroom, while Jeffrey remained with Officer Silvester. William Wood helped to remove the dog from the room, then remained in the room as Officer Doerr searched it. Testimony by Officer Doerr and William Wood differed with respect to the officer's search of the room. However, it is undisputed that during his

**Memorandum Decision and Order – page 2**

search of the room, Officer Doerr found and seized a firearm of illegal length.
When asked, Mr. Wood told the officer that it was Jeffrey's room.  Officer Doerr
then called Jeffrey into the room and asked him about the firearm.

Mr. Koepnick stated that the firearm belonged to Marcus, and Jeffrey had
taken it away because he did not want Marcus to get in trouble for having it.  On
questioning the following day, Mr. Koepnick acknowledged to Officer Doerr that
he had worked on cleaning up and repairing the firearm with Marcus after Marcus
found it about 2 ½ months before, and Jeffrey was aware that the firearm was of an
illegal length.

## ANALYSIS

A warrantless search is presumptively unreasonable under the Fourth
Amendment to the Constitution, except in limited circumstances.  *Kyllo v. United
States*, 533 U.S. 27, 31, 121 S. Ct. 2038 (2001); *United States v. Reid*, 226 F.3d
1020, 1025 (9th Cir. 2000), *quoting United States v. Shaibu*, 920 F.2d 1423, 1425
(9th Cir. 1990).  The burden of justifying a warrantless search is on the
government.  *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991).

## 1.    Marcus's Lack of "Standing" to Challenge the Search

The United States argues that Marcus Koepnick lacks standing to raise a
Fourth Amendment challenge to the search and seizure in this matter.  *See*

**Memorandum Decision and Order - page 3**

*Government's Supplemental Memorandum in Opposition to Defendant's Motion to Suppress* (Docket No. 24 in Case No. CR-09-064-S-BLW).  The United States Supreme Court has framed the question of who has the right to challenge a search, as a substantive Fourth Amendment issue of who has a legitimate expectation of privacy in the area searched.  *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 756 (9th Cir. 2009), *citing Rakas v. Illinois*, 439 U.S. 128, 140, 99 S. Ct. 421 (1980); *see also Minnesota v. Carter,* 525 U.S. 83, 88 (1988).  The defendant has the burden of demonstrating a legitimate or reasonable expectation of privacy.  *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995); *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S. Ct. 2556 (1980).

The "legitimate expectation of privacy" inquiry has both a subjective and an objective component.  *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979), *citing Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967)[1]; *see also United States v. Monghur*, _ F.3d _, 2009 WL 2434396 at 4 (9th Cir. 2009) (rejecting argument that defendant waived his expectation of privacy where he demonstrated "both an

---

[1]The Supreme Court addressed a petitioner's Fourth Amendment right to privacy from the installation and use of a pen register (to record numbers dialed from a telephone at petitioner's home) by a telephone company, at the request of police in *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577 (1979).  In *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), the Supreme Court considered whether electronic surveillance by the government violated a defendant's Fourth Amendment rights.  Although the facts in these two cases are distinguishable from the instant case, the test employed by the Supreme Court in its Fourth Amendment analysis is appropriately applied here.

**Memorandum Decision and Order – page 4**

objective and subjective intention to preserve privacy").  The Court must first

consider whether, through his conduct, the individual has "exhibited an actual

(subjective) expectation of privacy," in other words, whether he has demonstrated

that he "seeks to preserve [something] as private."  *Smith*, 442 U.S. at 740, *quoting*

*Katz*, 389 U.S. at 361, 351. Second, the Court must determine whether the

individual's subjective expectation is objectively "justifiable," in other words,

whether his expectation of privacy is "one that society is prepared to recognize as

'reasonable.'"  *Smith*, 442 U.S. at 740-41, *quoting Katz*, 389 U.S. at 353, 361.

Applying this two-part test from *Smith* and *Katz*, the first consideration is

whether Marcus demonstrated an actual expectation of privacy – whether, through

conduct, he sought to preserve his privacy in the searched area.  The only evidence

put forth at the hearing regarding Marcus's expectation of privacy was Jeffrey's

testimony – provided after Marcus joined in the Motion to Suppress – that Marcus

lived in and had unrestricted access to Jeffrey's entire house.  However, Jeffrey's

actions and further testimony support that Marcus *lacked* an expectation of privacy

in Jeffrey's bedroom, where the firearm was found.  In explaining how the firearm

came to be there, Jeffrey told Officer Doerr that he had taken it away from Marcus.

Jeffrey testified that he hid the firearm in his bedroom behind a stack of clothes

and towels where Officer Doerr found the gun, in order "to keep it away from

**Memorandum Decision and Order - page 5**

Marcus."

It was Jeffrey, not Marcus, who hid the gun in Jeffrey's bedroom. Indeed, there is no indication that Marcus ever accessed that room. There is simply no evidence that Marcus engaged in any conduct to preserve his privacy in Jeffrey's bedroom. The Court finds that, based on the evidence before it, Marcus has failed to meet his burden of proving a subjective expectation of privacy in the searched area where the firearm was found.

In so finding, this Court is mindful of cases holding that an overnight guest has a reasonable or legitimate expectation of privacy in another's home for purposes of Fourth Amendment "standing." *Minnesota v. Olson*, 495 U.S. 91, 96, 98 (1990); *see also United States v. Gamez-Orduno*, 235 F.3d 453, 458 (9th Cir. 2000). In *Olson*, the United States Supreme Court held that the expectation of privacy exists "despite the fact that [the guest has] no legal interest in the premises and do[es] not have the legal authority to determine who may or may not enter the household." *Olson*, 495 U.S. at 99; *see also Gamez-Orduno*, 235 F.3d at 458 (overnight guest has a reasonable expectation of privacy regardless of his ability to demonstrate possession of keys to the premises, ability to come and go or admit or exclude others, etc.). However, the holdings in *Olson* and *Gamez-Orduno* concern the objective element of the expectation of privacy test – whether society would

**Memorandum Decision and Order - page 6**

recognize the proffered expectation of privacy as objectively reasonable.[2]

Even if Marcus had satisfactorily proven a subjective expectation of privacy – which this Court finds he did not – this Court is loathe to conclude that Marcus enjoyed an objective expectation of privacy in Jeffrey's bedroom, under the holdings in *Olson* or *Gamez-Orduno*.  Citing the Court's decision in *Rakas*, the *Olson* Court looked to whether the respondent's expectation of privacy was "rooted in 'understandings that are recognized and permitted by society.'" *Olson*, 495 U.S. at 100, *citing Rakas*, 439 U.S. at 144, n. 12.

The *Olson* Court recognized that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Id.* at 98.  In concluding that an overnight guest has a legitimate expectation of privacy, the Court further reasoned, "[t]he houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest.  It is unlikely that the guest will be confined to a restricted area of the house . . . ." *Id.* at 99.  Notably, whether the *guest* had a legitimate expectation of privacy in the *host's bedroom* was not before the Court in *Olson*.  Nor did the *Olson* court consider a guest who was both the son of the home's owner, and a

---

[2]The defendants' subjective expectations of privacy were not at issue in *Olson* or *Gamez-Orduno.*

resident of indefinite duration.  Both factors carry with them social customs that are distinguishable from those of the "overnight guest" contemplated in *Olson*.

In *Gamez-Orduno*, the area searched was a trailer in which ten men were found and arrested on charges relating to the transport of marijuana.  *Gamez-Orduno*, 235 F.3d at 456-57.  The arrested men knew the owner of the trailer and were overnight guests, staying in the trailer for rest and food.  *Id*., at 459.  As in *Olson*, the searched area was not the host's personal bedroom, and the guests were neither family of the host, nor long-term residents of the searched area.

Absent case law directly on point, and without further evidence in the record, this Court is reluctant to conclude that society would recognize Marcus Koepnick as having a reasonable expectation of privacy in his father's bedroom.  Were there evidence that Marcus actually accessed his father's room for some purpose and with any regularity, it might seem reasonable for him to expect freedom from intrusion in the room.  But that evidence is lacking here.  Indeed, Marcus's failure to demonstrate an actual expectation of privacy in his father's bedroom casts doubt on whether society would recognize his expectation of privacy in that room.

Ultimately, Marcus bears the burden of proving *both* a subjective and objective expectation of privacy, thus the Court need not reach a conclusion with respect to the objective element of its Fourth Amendment analysis.  Because

**Memorandum Decision and Order - page 8**

Marcus has failed to meet his burden of demonstrating a subjective expectation of privacy in Jeffrey's bedroom, this Court finds that Marcus lacks "standing" to make a Fourth Amendment challenge to the seizure of the firearm.  The Court is therefore left to consider only Jeffrey Koepnick's Fourth Amendment challenge to Officer Doerr's warrantless search.

**2.    The Proper Scope of Doerr's Search of the Premises Pursuant to Jeffrey's Consent**

"Consent, when voluntarily granted by someone with authority, is one of the recognized exceptions to the warrant requirement."  *State v. Hansen*, 138 Idaho 791, 796, 69 P.3d 1052 (2003), *citing State v. Brauch*, 133 Idaho 215, 219, 984 P.2d 703 (1999)*; see also United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988 (1974).  In this case, the Defendant does not challenge that Jeffrey Koepnick freely and voluntarily consented to a search of his house.  Rather, Defendant contends that Officer Doerr exceeded the scope of consent given by Jeffrey.

The standard for measuring the scope of an individual's consent to search is "objective reasonableness," or what a typical reasonable person would have understood the scope of consent to be given the exchange between officer and suspect.  *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801 (1991) (other citations omitted).  The parties in this case agree that Jeffrey Koepnick consented

to and cooperated in a search of his house for Marcus Koepnick.  That consent
defines the scope of the search which Officer Doerr could make without violating
Jeffrey's Fourth Amendment rights.   In other words, Doerr could only search
places where Marcus might be located and, upon determining that Marcus was not
located in a particular area, he must end his search of that location.

Defendant argues that Officer Doerr could have determined that Marcus was
not in Jeffrey's bedroom by simply looking into the bedroom from the doorway, or
at least by a more cursory examination which could have been completed before
Doerr was in a position to see the firearm.  The Court rejects this argument and
finds it was reasonable for Officer Doerr to more thoroughly search the bedroom.
Being unfamiliar with the room, it was reasonable for the officer to enter and
survey the room to see whether Marcus could be hiding in the closet or under the
bed.  Determining whether Marcus was under the bed, necessarily involved
walking over to peer into the narrow space between the waterbed and the exterior
wall of the bedroom.   Thus, the Court concludes that Officer Doerr did not violate
Jeffrey's Fourth Amendment rights by entering the bedroom, walking around the
waterbed, and bending down to peer into the space between it and the wall.

**3.      The Plain View Doctrine**

"[I]t is well established that under certain circumstances the police may seize

**Memorandum Decision and Order - page 10**

evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). Generally speaking, an item is in plain view if it can be seen by the officer from a vantage point where the officer has a right to be. Under the "plain view" doctrine, evidence is properly admissible at trial where two requirements are met: "officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent." *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005), *quoting Roe v. Sherry*, 91 F.3d 1270, 1272 (9th Cir. 1996) (other citations omitted). To be immediately apparent, the officer must have probable cause to believe the seized item is contraband. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). Application of the plain view doctrine turns on the Court's factual findings with respect to the search.

### a.    Conflicting testimonies

According to Mr. Wood, Officer Doerr entered the room, went straight to the stack of laundry, then ran his arms elbow-length into the stack three times before pulling out a firearm that had been obscured from view. Absent any supporting evidence, the Court does not find this account to be credible. It makes little sense that the officer's first action in searching the room would be to reach blindly into a stack of laundry.

**Memorandum Decision and Order - page 11**

Neither does the Court simply adopt Officer Doerr's account of events. According to Officer Doerr, he first looked in the closet, then knelt between the bed and wall to see if Marcus was under the bed.  As discussed above, this action was within the scope of the search consented to by Jeffrey.   When the officer stood and looked towards the dresser, he saw what looked like the sawed-off stock, or butt-end, of a shotgun or other weapon, protruding from behind a stack of towels. *Transcript of Proceedings July 17, 2009*, (*Transcript*) at 19.  The officer testified that, based on his identification of the object as a sawed-off shotgun, he stepped closer and saw the firearm's barrel extending behind the stack of laundry and resting against the wall.  The officer testified that at this point, he was able to see the entire firearm, and the barrel also appeared to be sawed-off such that the total length of the firearm was roughly16 inches.  Upon seeing that the firearm was of illegal length, Officer Doerr seized it.

**b.     Identification of the firearm**

The Court has had occasion to observe a number of firearms, including those which have been sawed-off.  The seized firearm in this case, which was made available for the Court's observation, was a break action shotgun, sawed off at both ends, highly polished, and remarkably short in length.  In this case, the sawed-off edge of the firearm's stock was not taped or rough, as is often the case with

modified weapons, but notably well-lacquered and -polished.  Observed by itself, the stock is – in the Court's opinion – unrecognizable as the handle of a shotgun or rifle with the stock sawed off.  When viewing the firearm – starting with the stock end and proceeding to the barrel end – the first feature by which one can identify the object as a rifle or shotgun, rather than simply a legal pistol, is the thumb-release lever, which allows the action to be opened, and cartridges loaded into the chamber.  This metal lever would not be visible unless at least 4 inches of the firearm were exposed.

At hearing, when asked how short the stock of the firearm appeared to be, Officer Doerr responded, "It was short.  I couldn't see very much of it." *Transcript* at 20.  At no point did Officer Doerr mention the release lever, or any other distinguishing feature by which he was able to identify the polished object as the sawed-off stock of a shotgun.  There is no evidence that Officer Doerr has particular expertise in identifying weapons; in fact, when asked if he was familiar with firearms, Officer Doerr responded, "A little bit." *Transcript* at 48.

While the Court finds that Officer Doerr saw the handle of the shotgun protruding from the stack of laundry, the Court also finds that he did not see the release lever of the firearm, and could not have identified the object as a sawed-off or short-barreled  shotgun when he first spotted it.  Accordingly, it was not

**Memorandum Decision and Order - page 13**

immediately apparent that the protruding object was an illegal firearm, and the officer lacked probable cause to inspect the object more closely. Officer Doerr's actions in approaching and pulling out the weapon therefore exceeded the scope of the consented-to search.

As acknowledged by the parties, the government has the burden of justifying a warrantless search. *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991). In this case, the government has not met its burden of establishing that the firearm was in plain view and that the officer acted within the scope of consent when he pulled the firearm out for closer examination. Defendant Jeffrey Koepnick's Motion to Suppress the seized firearm is therefore granted.

## 4.      Fruit of the Poisonous Tree

Defendant also moves to suppress Jeffrey's statements made regarding the firearm after its seizure. The United States Supreme Court has held that indirect as well as direct products of a search and seizure conducted in violation of the Fourth Amendment are inadmissible evidence. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182 (1920). Under this "fruit of the poisonous tree" doctrine, the indirect products or "fruits" of an unlawful search and seizure may not be used if "come at by exploitation of that illegality," but only if obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v.*

**Memorandum Decision and Order - page 14**

*United States*, 371 U.S. 471, 488, 83 S. Ct. 407 (1963), *citing* Maguire*, Evidence of Guilt*, 221 (1959).

In this case, the statements made by Jeffrey regarding the firearm resulted from Officer Doerr's seizure of the weapon.  There is no evidence that the taint of the illegal seizure was purged.  Accordingly, Defendant Jeffrey Koepnick's Motion to Suppress statements made following the firearm seizure is also granted.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendant Marcus Koepnick lacks "standing" to raise a Fourth Amendment challenge to the search and seizure, therefore his Motion to Suppress (by joinder granted in Docket No. 23 in Case No. CR-09-64-S-BLW) shall be, and the same is hereby, DENIED.

IT IS FURTHER ORDERED THAT Defendant Jeffrey Koepnick's Motion to Suppress (Docket No. 16 in Case No. CR-09-65-S-BLW) shall be, and the same is hereby, GRANTED.

DATED:  **August 20, 2009**



Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order - page 15**